116 480
d120 829

(40 South. 844.)

No. 15,837.

KING v. ERSKINS et al.

(March 26, 1906.)

1. MALICIOUS PROSECUTION—LIMITATIONS.

To charge a person with a crime, without actual malice, but also without probable cause, is a quasi offense, the action to recover damages resulting from which is barred by the prescription of one year from the day upon which such damage is sustained; and where there is an interval of time between the date upon which the charge is preferred and that upon which it is made known to the person so charged and to the public by the arrest of such person, the damage is sustained upon, and the prescription begins to run from, the day of the arrest.

[Ed. Note.—For cases in point, see vol. 33, Cent. Dig. Malicious Prosecution, § 89.]

2. SAME—DAMAGES—ADVICE OF COUNSEL.

Defendants in an action for damages for malicious prosecution, though no actual malice is shown, are in no wise protected by the advice of counsel from liability for actual damages, such as expenses incurred, inconvenience suffered, and injury to feelings and character, unless it be clearly shown that all the facts were laid before the counsel and that he actually gave the advice relied on.

[Ed. Note.—For cases in point, see vol. 33, Cent. Dig. Malicious Prosecution, § 41.]

(Syllabus by the Court.)

Appeal from Fifth Judicial District Court, Parish of Winn; George Wear, Judge.

Action by Susan M. King against J. Kindred Erskins and others. Judgment for defendants, and plaintiff appeals. Reversed, and judgment rendered for plaintiff.

John H. Mathews, for appellant. James Thompson Wallace and Casimir Moss, for appellees.

### Statement.

MONROE, J. This is an action in damages for an alleged malicious prosecution. Defendants, J. Kindred Erskins, Alce C. Beavers, and A. Jackson White, pleaded the prescription of one year, and the plea was overruled, whereupon they answered, denying malice, and alleging probable cause, upon which issue the case was . tried, with the result that there was a verdict and judgment for the defendants, from which plaintiff has appealed.

It appears from the evidence that, about 18 years prior to the trial in the district court, the plaintiff, who is now a widow with three children, acquired, possibly in community, a tract of land upon which there was a building that was then and afterwards used for the purposes of a public school, and that a year or two before the trial a new building was erected upon the same site, without objection upon her part, though it is not denied that she and her children own the land. It further appears that, some time prior to the month of July, 1903, she became dissatisfied with the manner in which one of her children had been treated as the result of some trouble which had arisen between it and another child, and she forbade the teacher from keeping the school any longer upon her land, and told the defendant Erskins (who appears to have taken an active interest in the school) that she wanted him to remove the building and did not want another school taught there. The teacher to whom she spoke gave up the school at the end of the then current term, and, arrangements having been made to reopen it with a new teacher on the second Monday in July, plaintiff told Erskins, who called at her house to inform her of that fact, that she objected and would be on hand to stop it.

She accordingly presented herself at the 116 LA.—16

schoolhouse upon the following day (being the day of the opening) and stated her objections to the new teacher, who informed the patrons there assembled, and told them that he would leave the matter to them. What then took place is told by the defendant Erskins as follows, to wit:

"I wanted to go on with the school. I suggested that we go on with it, but Mr. Mays and some of the others suggested that they did not think that we had the right to do it—that she had the right to object to our teaching in the house; and we considered the matter, and I saw that some of them were afraid to risk the law on it. I saw that it would divide the school, and I was building a new house about a quarter from there, on the same road, and I just got up and announced to the people, publicly, that to prevent the school from not being taught, I would give up the house. Well, there was no objection to that, that I heard of, and we moved down to the house. It was a right new building, and we had to fix it up temporarily, and we held a consultation about the matter, (and) after we fixed the house we sent two of the trustees, or three of the patrons —I think two were trustees—out here to Winnfield to see the superintendent, to get his opinion about our teaching in the adopted house, and they came back and reported. And Mr. Miller said it was very inconvenient for him to be teaching the school there, that the water was sorry, that the house was not fitted up, and that he much preferred teaching in the schoolhouse; and so we moved back to the schoolhouse.
* * *

"Q. Now, notwithstanding that it was Mrs. King's land that the house stood on, and that she objected to further using it for that purpose, you were in favor of going ahead and teaching the school? A. Yes, sir; several were afraid to risk the law. I said it was a public location, and no one can object to our using it."

Beavers, another of the defendants, testified that he heard plaintiff say, on the morning that the school opened, that, "if her children could not go there, nobodys else's should," and that, "if there was any law to protect her, she intended to have it." Miller, the teacher, testifying concerning his conversation with the plaintiff, says:

"Well, she told me that her children had been whipped out of their rights, and that the school was on her land, and that she did not want any school of any kind; that she wanted the land for a pasture. She advised me to go back home, and not to undertake to teach school there or stay in the neighborhood. * * * She said that she would die before she would be

treated in that way and suffer her children to be beat out of their rights. Q. What statement, if any, did she make in the way of threats, or in any other way, if the school should be carried on? A. That was the only one she made —that she would die. She said that six or seven times. Q. Did she say that she would die and go to hell before another school should be taught there? A. Well, I can't say that; but she had said that she would die. She said that the patrons would get into trouble, and that I would get into trouble, and she went on to say that it was as true as there is a God and Christ made little apples."

Plaintiff, on the other hand, says (referring to Miller):

"I told him that I would not. suffer the school to be taught, if there was any law. I told him that my children had been whipped and beat out on account of Mr. Erskins' and Mr. Beavers' children, and that the school should not be taught on my and my childrens' land."

And she denies the other statements attributed to her.

On the 9th of August, 1903, after the school had been going on for about a month, Mr. Erskins, who lived near by, being out at or before daylight, observed that the building was on fire, and, on going near, found that the fire had so far progressed that he and his boys were unable to extinguish it, and the building was destroyed. He sent word to the patrons, and then went home to his breakfast, after which he returned to the vicinity of the school site and there found tracks, made, as he assumed, by a woman's shoe, which he traced to and from the site of the school building, and which he also found leading to and from the plaintiff's fence (100 yards or more from her house) as far as an old field, situated between the school and the house. He did not measure the tracks, but says that he saw them measured, that they were made by a No. 6 or 7 shoe, and that they ran for the most part along the side of, and "shunned, the public road." He also says that he or they (defendants) made some inquiry as to the plaintiff's whereabouts on the night of the fire, as follows:

"Q. Did you make any effort to find out where Mrs. King was on that night when the schoolhouse was burned? A. Yes, sir; we asked some questions. Q. Who did you ask? A. Well, we asked several persons. * * * Q. Did you find out before you had the certificate [warrant] issued? A. We do not know of our personal knowledge, that night. Q. Well, did you find out—did you try to find out—where she stayed that night? A. Yes, sir; there were several persons who made inquiries. Q. Where did you find out she stayed that night? A. We found that she stayed at Martin King's. Q. Did you doubt the statements that she stayed at Martin King's? A. No, sir."

The witness and the other defendants also testify that they consulted the district attorney, though what they told him and what he told them is left in considerable doubt; that officer not having been placed on the stand. It seems, however, that they obtained from him something in writing, which they presented to a justice of the peace in Winnfield, before whom they made the charge upon which plaintiff was arrested; but the writing was not produced, and the testimony does not enable us to do more than guess at its contents.

It is shown, by uncontradicted testimony, that during the early part of the night of the fire the schoolhouse was used for the purposes of a C. M. A. lodge meeting, at which some 15 or 20 men attended, and that some of them smoked cigarettes, and one of the number testifies that he got home about 11 o'clock, from which it may be inferred that the meeting adjourned between 10 and 11. Defendant's witnesses testify that the track referred to was apparently made by a woman's coarse shoe, or a man's fine shoe, and it appears that, upon the road leading to the schoolhouse there were a great many tracks, but whether like the one in question is not shown. The plaintiff, according to her testimony, wears in summer a fine thin No. 6 shoe, and she testifies, and is corroborated by her sister-in-law and her mother, without attempt at contradiction, that she spent the night of the fire at the house of her sister-in-

law, Mrs. Martin King, which is about three miles from the site of the schoolhouse and about half a mile from plaintiff's house; but whether plaintiff lives between Mrs. Martin King's and the schoolhouse site is not shown.

Defendants testify that they were actuated by a sense of duty, and deny under oath that they were influenced by malice. It is shown that, after her arrest, plaintiff gave bond for her appearance, that she employed an attorney at a cost of $25, and that she attended court two or three times and appeared before the grand jury, by which body she was discharged. The affidavit was made against her on August 11, 1903. She was arrested and gave bond October 30th following. She was discharged in January, 1904, and citation was served in this suit October 18, 1904.

### Opinion.

The claim arises from an alleged quasi offense (Perrillat v. Puech, 2 La. 429; Edwards v. Turner, 6 Rob. 382), and the action is subject to the prescription of one year, from the day "on which the damage was sustained." Civ. Code, art. 3537. It is evident that, so long as plaintiff was ignorant of the charge which was made against her, she sustained no injury to her feelings; that so long as the public was ignorant of it she sustained no injury to her character; that until she was arrested she suffered no inconvenience and sustained no expenses on account of such charge; and it does not appear from the record that the charge was made public or that the plaintiff knew of it until she was arrested, which was within 12 months of the service of citation herein. It follows that the plea of prescription was properly overruled. Mestier v. N. O. & G. W. R. R. Co., 16 La. Ann. 354; Lizardi v. N. O. Canal & Banking Co., 25 La. Ann. 414; Hotard et al. v. Railway Co., 36 La. Ann. 501. "It is incumbent on the party pleading prescription

to show what portion of the damage proved occurred anterior to the year preceding the institution of the suit, or, in other words, to establish what part of the plaintiff's demand is prescribed." Lizardi v. Bank, supra.

On the merits, it is undisputed that the plaintiff owned the land upon which the schoolhouse was situated, and, whilst her acquiescence in the establishment and maintenance there of the school may have entitled the school authorities to some consideration in the matter of its removal, she also had some rights which appear to have been given no consideration whatever. It may be, and we think it most likely, from the testimony of the teacher, that plaintiff was mistaken; but mothers are not apt to see matters of that kind as others see them, and she believed that her children had been unjustly treated, and, so believing, was unwilling that the school in which that treatment had been received should be maintained upon her and their land; and she protested against it, perhaps, violently, but the nearest approach to a threat which she is proved to have made was her statement that she would have the law, if there was any to be had, and would give trouble. As the school was maintained in spite of this protest, the defendants, no doubt, realized that she would be thereby more embittered, and, when the building was burned, were ready apparently to adopt, without any very good reason for so doing, the conclusion that she had set fire to it, and, having found tracks leading from the schoolhouse and leading from the fence (within 100 yards, or so, of her house), though they were not connected by half a mile or more, they assumed that they were the same tracks, and that they had been made by plaintiff in going upon and returning from that errand. It would seem to be enough to say of this theory that the defendant Erskins testifies

that, from what he learned (whether before the charge was made or afterwards is not made clear), he had no doubt that the plaintiff spent the night of the fire at the house of her sister-in-law, and, as it is shown that she was there from dusk of the evening before until after the schoolhouse was burned on the following morning, it follows that the tracks leading to and from her house were not made by her, or, if made, were not made either in going to or returning from the schoolhouse. Beyond this, we have the evidence that there were 15 or 20 persons at the schoolhouse on the night of and before the fire, some of whom may have been boys wearing No. 6 shoes, and some of whom are shown to have been smoking cigarettes, facts of which, as also the fact that plaintiff spent the night away from her house, we are inclined to think the defendants were ignorant when they made the charge against plaintiff, or, if they knew, attached less importance to them than they should.

As the matter stands we are of opinion that, whilst they were not influenced by actual malice, their sense of public duty was more or less mixed with those considerations, affecting their personal convenience as patrons of the school, which had led to the ignoring of the plaintiff's request that the schoolhouse be moved from her and her children's land. In any event, they acted precipitately and without probable cause, and they are in no wise protected by the advice of the district attorney, since it is not shown that he was correctly informed as to the facts or that he really advised the action taken by them. We therefore conclude that plaintiff is entitled to recover for the expense and inconvenience to which she was subjected and for injury to her feelings and character, and we fix the total amount at $350. It is accordingly ordered, adjudged, and decreed that the verdict and judgment

appealed from be annulled, avoided, and reversed, and that there now be judgment in favor of the plaintiff, Mrs. Susan M. King, and against the defendants, J. Kindred Erskins, Alce C. Beavers, and A. Jackson White, in solido, in the sum of $350, with costs in both courts.